**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| M.N., INDIVIDUALLY AND ON BEHALF OF A.D., & A.D., <br><br> *Plaintiffs,* <br><br> v. <br><br> SPARTA TOWNSHIP BOARD OF EDUCATION, NEW JERSEY DEPARTMENT OF EDUCATION, & ANGELICA ALLEN-MCMILLAN, ACTING COMMISSIONER OF EDUCATION, IN HER OFFICIAL CAPACITY, <br><br> *Defendants.* | Civil Action No. 21-19977 <br><br><br> **OPINION** |

**John Michael Vazquez, U.S.D.J.**

This matter comes before the Court on Plaintiffs M.N. and A.D.'s (collectively "Plaintiffs"

motion, pursuant to Fed. R. Civ. P. 65 and L. Civ. R. 65.1, for a preliminary injunction.  D.E. 11.

Plaintiffs seek an order reenrolling A.D. in Sparta High School pursuant to the Individuals with

Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*.  Defendants, the Sparta Township

Board of Education ("STBOE"), the New Jersey Department of Education ("NJDOE"), and

Angelica Allen-McMillan, the Commissioner of Education, (collectively with NJDOE "the State

Defendants") oppose Plaintiffs' request.  The Court has reviewed the parties' submissions[1] and

held oral argument on February 10, 2022 and March 30, 2022.  For the reasons set forth below,

Plaintiffs' motion is **DENIED**.

---

[1] The submissions include Plaintiffs' brief in support of the motion, D.E. 11-1; the State Defendants' response to the motion, D.E. 19; the STBOE's response to the motion, D.E. 21; Plaintiffs' supplemental brief, D.E. 41; the State Defendants' supplemental brief, D.E. 42; the State Defendants' supplemental reply brief, D.E. 45; Plaintiffs' supplemental reply brief, D.E. 47; and the STBOE's supplemental reply brief, D.E. 48.

## I.     BACKGROUND

### A. Facts

The operative facts do not appear to be disputed.  Plaintiff A.D. is a nineteen-year-old young man who suffers from disabilities.  D.E. 17 ("Am. Compl.") ¶ 20.  A.D. lives in Sparta, New Jersey.  *Id.* ¶ 21.  He is Plaintiff M.N.'s son, and he lives with M.N. and his father, R.D., who is not a party. *Id.* ¶¶ 25, 50.

A.D. began attending Sparta High School at the start of the 2018-2019 school year, his sophomore year.  D.E. 11-2 ("M.N. Cert.") ¶ 4.  With M.N.'s input, the school district's Child Study Team formulated and implemented an Individualized Education Program ("IEP") for A.D. *Id.*  The IEP's twin aims were to ensure that A.D. graduated from high school upon completing a traditional four-year curriculum and that A.D. received a standard high-school diploma.  *Id.* ¶ 5.

A.D. adjusted well in his first few months at Sparta High School.  *Id.* ¶ 6.  However, in early 2019, M.N. became concerned that A.D. was falling victim to peer pressure at Sparta High School and developing nicotine dependence through vaping.  *Id.* ¶ 7.  Additionally, a March 9, 2018 email to M.N. from Susanna Allison, a high school counselor, indicated that A.D. had a significant number of unexcused absences and was in danger of losing credit for several courses. D.E. 11-2 at 12.  After meetings with the school district in February and March of 2019, M.N. decided to place A.D. in home instruction.  M.N. Cert. ¶ 7.  M.N. began A.D.'s full-time instruction on March 11, 2019.  *Id.*  Plaintiffs allege that because of the district's requests for professional and medical assessments, the district delayed approving remote learning.  *Id.* ¶ 8.  To ameliorate the effects of the delay, M.N. had A.D. review GED materials.  *Id.*  M.N. informed the district of her intention, telling them that A.D.'s use of GED materials would be "a temporary framework."  *Id.* ¶ 9.

2

A.D. reenrolled in Sparta High School on April 17, 2019.  *Id*. ¶ 12.  The school placed A.D. on home instruction through a software program called "Educere," and augmented that regimen with "limited in-person tutoring."  *Id.*  In the meantime, A.D. took and passed the GED exam.  *See id.* ¶ 13.  The State of New Jersey awarded A.D. a high school diploma on April 29, 2019.  *Id.*  The State issued the diploma based on A.D.'s score on the GED exam.  *Id.*

On May 22, 2019, Sparta's Vice-Principal Michael Lauricella sent a letter to M.N. advising her that the school would not provide A.D. with any educational services because he had received a GED.  *Id.* ¶ 14.  M.N. responded that the school's actions would violate the IDEA.  *Id.* ¶ 15.  Lauricella represented that he had consulted with the school district's lawyer and told M.N. that A.D. had the right to enroll in the school until he turned twenty-one, for the purpose of obtaining a standard high school diploma.  *Id.*  After M.N. met with Lauricella and the school's director of special services, the school resumed A.D.'s home instruction.  *Id.*  On June 13, 2019, the STBOE devised a new IEP for A.D.  Am. Compl. ¶ 51.

A.D. returned to Sparta High School for in-person classes at the beginning of the 2019-2020 school year, his junior year.  *Id.* ¶ 52.  A.D. transitioned well, except that he required some additional support with his work.  *See* M.N. Cert. ¶ 17.  In March of 2020, the high school was closed for in-person instruction because of the COVID-19 pandemic, and A.D. was sent back to remote learning.  Am. Compl. ¶¶ 52-53.  A.D. became "despondent over the prospect of continued remote learning with no end in sight."  M.N. Cert. ¶ 18.  He received what M.N. considered to be inadequate support from Sparta High School.  *Id.* ¶ 17.  On May 27, 2020, A.D. was given another IEP, again created with M.N.'s input, which said that "[A.D.] is encouraged to stay with the remote learning and complete his junior year as there are many social and peer experiences awaiting him in senior year which he will benefit [from] and enjoy."  Am. Compl. ¶ 55 (alterations in original).

M.N. withdrew A.D. from the high school on June 8, 2020 because of his difficulties with remote learning.  *Id.* ¶¶ 57-58.

With the permission of school and district representatives, M.N. began the process of reenrolling A.D. in the high school in September of 2020.  M.N. Cert. ¶ 19.  However, because it was apparent to Plaintiffs that A.D.'s education would involve remote learning, A.D.'s family decided not to complete the enrollment process.  *Id.*  Instead, A.D. enlisted in the United States Army.  D.E. 1 at 50 ¶ 11 (ALJ Betancourt's recitation of facts in EDU Case).  On December 16, 2020, A.D. was medically discharged from the service.  *Id.* at 50 ¶ 12.

In-person learning began again at Sparta High School in the spring of 2021, and M.N. attempted to reenroll A.D. in April or May.  Am. Compl. ¶ 59; M.N. Cert. ¶ 20.  The STBOE rebuffed Plaintiffs' attempt, saying that A.D.'s receipt of a New Jersey high school diploma ended his eligibility for enrollment.  Am. Compl. ¶ 59.

### B. Procedural History

On May 10, 2021, Plaintiffs filed a due process petition with the Office of Special Education Dispute Resolution ("SPEDR"), alleging that the STBOE had violated the IDEA.  *Id.* ¶ 61.  The parties refer to that action as the "EDS Case."  *See id.*  SPEDR transferred the EDS Case to the New Jersey Office of Administrative Law ("NJOAL") on June 6, 2021.  *Id.* ¶ 62.

While the EDS Case was pending, the STBOE filed a June 11, 2021 petition for a declaratory ruling with the NJDOE Office of Controversies and Disputes.  *Id.* ¶ 74.  The parties refer to that action as the "EDU Case."  *Id.*  The STBOE sought a declaration that A.D.'s receipt of a diploma terminated his right to special education from the STBOE under the IDEA, N.J. Stat. Ann. § 18A:46-1.1, *et seq.*, and all applicable regulations.  *Id.*  That matter was likewise transferred to the NJOAL on July 9, 2021.  *Id.* ¶ 77.

Both the EDS and EDU Cases were assigned to Administrative Law Judge ("ALJ") Thomas R. Betancourt, but the ALJ did not consolidate them. *Id.* ¶ 78. Instead, the ALJ granted the STBOE's motion to decide the EDU Case as a summary proceeding and issued a written initial decision on August 16, 2021, agreeing with the STBOE that because A.D. had obtained a state-issued diploma, he was precluded from reenrolling in Sparta High School. D.E. 1 at 48-55. Commissioner Allen-McMillan issued a final decision in the EDU Case on September 28, 2021, concurring with ALJ Betancourt and granting the STBOE's petition. *Id.* at 44-47. M.N. has appealed that decision, and it is pending before the Appellate Division of the Superior Court of New Jersey. D.E. 1 at 26.

On August 24, 2021, ALJ Betancourt held a one-day trial in the EDS Case. Am. Compl. ¶ 63. The ALJ heard the testimony of Dr. Susan Lorentz, Sparta School District's School Psychologist and A.D.'s case manager, as well as the testimony of M.N., and reviewed several exhibits. D.E. 1 at 30-32, 37-38. The following day, August 25, 2021, ALJ Betancourt entered an order dismissing M.N.'s petition, relying on his reasoning in the EDU Case and again ruling that A.D.'s receipt of the state-issued diploma ended his eligibility for a free appropriate public education ("FAPE"). *Id.* at 35-36.

On November 12, 2021, Plaintiffs filed a Complaint in this Court. D.E. 1; *see also* 20 U.S.C. §§ 1415(i)(2)-(3). Plaintiffs attack the judgments in both the EDS and EDU Cases and "seek to reverse the Final Decision of ALJ Betancourt, pursuant to the IDEA, [and] to enjoin the Final Decision of Commissioner Allen-McMillan, pursuant to 42 U.S.C. § 1983[.]" Am. Compl. ¶ 13. Plaintiffs filed the instant motion on December 21, 2021. D.E. 11. After the Court set a

briefing schedule and heard oral argument on February 10, 2022, the Court ordered Plaintiffs and the State Defendants to submit further briefing, D.E. 33,[2] and then heard additional argument.

## II.    STANDARD OF REVIEW

Injunctions are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1. A preliminary injunction is "extraordinary" relief. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). Injunctive relief may only be granted when a party demonstrates that it has a reasonable probability of success on the merits, it will suffer immediate and irreparable harm if the injunction does not issue, the grant of preliminary relief will not result in greater harm to the nonmoving party, and the injunctive relief is in the public interest. *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012). A court must balance the four factors, provided that the party seeking the injunction demonstrates that it can satisfy the first two factors. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). In doing so, the court must "determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* In addition, if the moving party seeks a mandatory injunction, or one that alters the status quo, the party seeking the injunction must satisfy a heightened standard. Such plaintiffs must "show a substantial likelihood of success on the merits and that their 'right to relief [is] indisputably clear.'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (quoting *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)).

---

[2] The parties have not made the full administrative record available for the Court's review, *see* D.E. 56 (Plaintiffs requesting that the NJOAL transmit the record to this Court's Clerk of Court), although Plaintiffs did make ALJ Betancourt's and Commission Allen-McMillan's decisions available for the Court's review, D.E. 1 at 28-38, 42-56.

### III.    ANALYSIS

The IDEA constitutes the federal government's guarantee that children who suffer from disabilities will receive the special education services they need.  *Fry v. Napoleon Cmty. Schs.*, 580 U.S. --, 137 S. Ct. 743, 748 (2017).  To this end, "[t]he IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities."  *Id.* (quoting 20 U.S.C. § 1412(a)(1)(A)).  "As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction."  *Fry*, 137 S. Ct. at 748-49 (quoting 20 U.S.C. §§ 1401(9), (26), (29)).  A state is "not required to maximize the potential of every handicapped child," however it must provide an education with "significant learning" and "meaningful benefit" to the child.  *A.D.L. v. Cinnaminson Twp. Bd. of Educ.*, 975 F. Supp. 2d 459, 463 (D.N.J. 2013).  The IDEA also includes a mainstreaming component which requires education "in the least restrictive environment."  20 U.S.C. § 1412(a)(5)(A).

"The primary vehicle for implementing these congressional goals is the 'individualized educational program' (IEP), which the [IDEA] mandates for each disabled child."  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  "An IEP is a written statement, 'developed, reviewed, and revised' by the 'IEP Team'—a group of school officials and the parents of the student—that spells out how a school will meet an individual disabled student's educational needs."  *Y.B. ex rel. S.B. v. Howell Twp. Bd. of Educ.*, 4 F.4th 196, 198 (3d Cir. 2021) (quoting 20 U.S.C. §§ 1414(d)(1)(A), (B)).  An IEP sets forth the student's "'present levels of academic achievement,' offers 'measurable annual goals' to "enable the child to . . . make progress in the general educational curriculum,' and describes 'supplementary aids and services . . . provided to the child' to meet those goals."  *Y.B.*,

7

4 F.4th at 198 (alterations in original) (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I), (II)(aa), (IV)).

An IEP's focus is on the services a student needs to receive a FAPE.  *Y.B.*, 4 F.4th at 198.

"The IDEA [further] directs States to 'implement specified procedural safeguards to ensure children with disabilities and their parents are provided with due process.'"  *G.W. v. Ringwood Bd. of Educ.*, 28 F.4th 465, 469 (3d Cir. 2022) (quoting *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014)).  Therefore, if parents cannot resolve disputes as to their children's IEPs, the IDEA gives aggrieved parents the right to "an 'impartial due process hearing' before a state educational agency, § 1415(f); and, if still unsatisfied, [to] seek judicial review by filing an action in a competent state or federal court, § 1415(i)(2)."  *Y.B.*, 4 F.4th at 198; *see also Fry*, 137 S. Ct. at 749 (describing the IDEA's "formal procedures for resolving disputes.").  The party challenging the administrative decision "bears the burden of proof when challenging the appropriateness [of the education.]"  *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 392 (3d Cir. 2006).

### A. Likelihood of Success on the Merits

As noted, to obtain a preliminary injunction, a moving party must first show "that he is likely to succeed on the merits[.]"  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Plaintiffs contend that when the STBOE refused to allow M.N. to reenroll A.D. in Sparta High School in the spring of 2021, the STBOE violated the IDEA by denying a FAPE to a statutorily eligible student.  D.E. 11-1 at 15-16.  Defendants maintain, however, that A.D.'s right to a FAPE ended when he received his state-issued diploma.  D.E. 19 at 7.

Individuals with disabilities do not have an interminable entitlement to a FAPE.  Rather, in addition to aging out of eligibility, 20 U.S.C. § 1412(a)(1)(A); *see also id.* § 1412(a)(1)(B), federal regulations provide that, "[t]he obligation to make FAPE available to all children with

disabilities does not apply with respect to the following: . . . Children with disabilities who have graduated from high school *with a regular high school diploma*." 34 C.F.R. § 300.102(a)-(3)(i) (emphasis added). The regulation defines "regular high school diploma" as follows:

> As used in paragraphs (a)(3)(i) through (iii) of this section, the term regular high school diploma means the standard high school diploma awarded to the preponderance of students in the State that *is fully aligned with State standards*, or a higher diploma, *except that* a regular high school diploma *shall not be aligned* to the alternate academic achievement standards described in section 1111(b)(1)(E) of the ESEA[3]. A regular high school diploma *does not include* a recognized equivalent of a diploma, *such as a general equivalency diploma*, certificate of completion, certificate of attendance, or similar lesser credential.

*Id.* § 300.102(a)(3)(iv) (emphases added).

In New Jersey, the applicable state standards are found in N.J. Stat. Ann. § 18A:50A-1, N.J. Admin. Code §§ 6A:8-1 to -5.3, and N.J. Admin. Code §§ 6A:20-1 to -2.10. The regulations distinguish between "state-endorsed" and "state-issued" diplomas. A "[s]tate-endorsed diploma" is "a locally issued document awarded to an exiting student indicating successful completion of high school graduation requirements." N.J. Admin. Code § 6A:8-1.3; *id.* § 6A:20-1.2. A "[s]tate-issued diploma" is "a diploma issued by the State of New Jersey." *Id.* § 6A:8-1.3; *id.* § 6A:20-1.2. Thus, "state-endorsed" diplomas are issued by local authorities, while "state-issued" diplomas are issued directly by the State. *Id.*

The criteria for obtaining the diplomas differ. As to state-endorsed diplomas, the regulations provide that "[d]istrict boards of education shall award a State-endorsed high school diploma to prospective graduates who have met all of the requirements adopted in accordance with

---

[3] ESEA is shorthand for the Elementary and Secondary Education Act of 1965. The Every Student Succeeds Act (ESSA), 20 U.S.C. § 6301, *et seq.*, was enacted in 2015 and renamed the ESEA's successor, the No Child Left Behind Act. *See Every Student Succeeds Act (ESSA)*, U.S. Dep't of Educ., https://www.ed.gov/esea (last accessed Apr. 12, 2022).

N.J.[ Admin. Code §] 6A:8-5.1(a) or (c), or (d) below."  *Id.* § 6A:8-5.2(a).  N.J. Admin. Code § 6A:8-5.1(a) refers to a "typical" high school experience, and requires, among other things, that students complete 120 credits in certain courses and subject areas, have satisfactory attendance, demonstrate certain proficiencies, and meet any other criteria fixed by the students' local board of education.  *Id.* § 6A:8-5.1(a)(1)-(8).  N.J. Admin. Code § 6A:8-5.1(c) permits those authorities to award state-endorsed diplomas to students who have met alternate criteria "[t]hrough the IEP process[.]"  *Id.* § 6A:8-5.1(c).

As to state-issued diplomas,[4] the regulations permit the Commissioner of Education to grant those diplomas to individuals aged sixteen or older who are not enrolled in high school, provided that the individual achieved "the Statewide standard scored on the General Education Development test (GED) or other adult education assessments[.]"  *Id.* § 6A:8-5.2(c).[5]  The regulations further provide that "[s]tatewide standard scores for passage of GED tests or other adult education assessment tests shall be the minimum passing standard set by the respective test vendor and accepted by resolution of the State Board of Education."  *Id.* § 6A:20-1.4(a)(1)(i).

There is no dispute that A.D. earned a state-issued diploma solely by passing the GED exam (in addition to being at least sixteen years old and not enrolled in school).  The issue is whether A.D.'s state-issued diploma is a "regular high school diploma" embraced by 34 C.F.R. § 300.102(a)(3)(iv) or "a recognized equivalent of a diploma, such as a general equivalency diploma, certificate of completion, certificate of attendance, or similar lesser credential[]" spurned by the regulation.

---

[4] Such diplomas are authorized by statute.  N.J. Stat. Ann. § 18A:50A-1.

[5] A state-issued diploma may also be issued to an individual who obtains at least thirty general education credits from an "accredited institution of higher education."  N.J. Admin. Code § 6A:8-5.2(d)

In an IDEA case, a district court applies a "modified de novo standard . . . to its review of the underlying administrative proceedings." *Moynihan v. W. Chester Area Sch. Dist.*, -- F. App'x --, No. 21-2530, 2022 WL 636631, at *2 (3d Cir. March 4, 2022).  A district court "is required to give due weight to the factual findings of the ALJ." *L.E.*, 435 F.3d at 389.  Legal determinations, however, are given no weight; a district court reviews an agency's legal decisions using a pure de novo standard.  *A.D.L.*, 975 F. Supp. 2d at 463-46 (collecting cases).  Here, ALJ Betancourt based his decision in the EDS Case on his conclusion in the EDU Case.  D.E. 1 at 35.  Thus, the Court turns to the written opinions that the ALJ and Commissioner Allen-McMillan issued in the EDU Case.[6]

In the EDU Case, ALJ Betancourt quoted extensively from the Commissioner's decision in *B.A. & J.J. ex rel. Minor Child M.A.A. v. Board of Education of the Borough of Somerset County*, No. 280-9/07, 2009 N.J. AGEN LEXIS 730 (NJOAL, Comm'r of Educ., June 22, 2009),[7] which explained that there are multiple ways to earn a high-school diploma under the New Jersey regulations.  D.E. 1 at 52-53 (quoting *B.A.*, 2009 N.J. AGEN LEXIS 2009, at **5-8).  Finding *B.A.*'s analysis dispositive, the ALJ concluded that "what A.D. received is, in fact, a State issued

---

[6] The STBOE invites the Court to abstain from enjoining Defendant Allen-McMillan's order in the EDU Case because the STBOE asserts that it represents a question of state law (whether A.D.'s state-issued diploma fully complies with state standards).  *See* D.E. 21 at 28-40.  The EDU case is before the New Jersey Appellate Division, not this Court.  Yet, the Court is aware that given the procedural posture of this case (that is, the ALJ's reliance on the EDU decision in resolving the EDS case), the Court is effectively being asked to consider the Commissioner's ruling in the EDU case.  As explained during oral argument on March 30, 2022 and *infra*, the Court considers the primary legal issue to be whether A.D.'s state-issued diploma is a regular high school diploma within the meaning of the applicable *federal* regulation.  This is clearly a question of federal law, which this Court is well-equipped to decide.

[7] In the ALJ's decision, the ALJ quoted from the Commissioner's final decision in *B.A.* but provided the citation for the ALJ's initial decision.  *See* D.E. 1 at 52-53.  The Court provides the citation to the final decision.

high school diploma that is 'fully aligned with State standards.'  A.D. did not merely obtain a GED." D.E. 1 at 52, 53.

The Commissioner agreed.  Also quoting the *B.A.* decision, the Commissioner explained that obtaining a passing score on the GED "can legitimately evidence acquisition of an education sufficient to satisfy the statutory and constitutional mandate and warrant issuance of a State-endorsed diploma so as to end a student's entitlement to attend the public schools of a district." *Id.* at 46 (quoting *B.A.*, 2009 N.J. AGEN LEXIS 2009, at *11).  The Commissioner found that A.D. had obtained a regular high-school diploma, emphasizing that the New Jersey regulations do not distinguish between state-endorsed and state-issued diplomas.  D.E. 1 at 46.

The Court does not find the ALJ or Commissioner's decisions persuasive because each failed to analyze the full text of 34 C.F.R. § 300.102(a)(3)(iv).  When interpreting a regulation, courts begin with the regulation's text.  *Green v. Brennan*, 578 U.S. 547, 553 (2016).  Each decision focused on the first sentence of the regulation, which requires a regular high school diploma to be "fully aligned with State standards[.]" 34 C.F.R. § 300.102(a)(3)(iv).  Based on the New Jersey regulations cited above, it appears that A.D.'s state-issued diploma met New Jersey's standards.  However, each decision overlooked the last sentence of the regulation, which indicates that a regular high school diploma does not include a "general equivalency diploma" or "similar lesser credential." *Id.*  Here, A.D.'s New Jersey high school diploma was issued solely because he passed the GED exam.  Thus, the issue facing the Court is whether New Jersey can circumvent the federal regulation merely by issuing a high school diploma based on a GED exam.[8]

---

[8] As a general matter, the Court is not criticizing New Jersey's decision to award a high school diploma based on a GED exam.  The Court can imagine many laudatory goals that such a diploma accomplishes.  However, the issue for the Court is not whether New Jersey's policy is beneficial for students not subject to the IDEA.  Instead, the Court focuses on whether New Jersey is permitted to do so, as to students covered by the IDEA.

The regulation clearly indicates that a GED is not considered a regular high school diploma. Thus, providing a high school diploma solely based on a GED exam would seemingly contravene the regulation. At the same time, the regulation is arguably ambiguous. A regulation may be ambiguous where it is "susceptible to more than one reasonable reading." *Kisor v. Wilkie*, 588 U.S. --, 139 S. Ct. 2400, 2410 (2019). In striving to interpret arguably ambiguous regulatory text, "a court must exhaust all the traditional tools of construction." *Id.* at 2415 (citation and quotation marks omitted)). Applying those tools entails conscientiously evaluating "indicia like text, structure, history, and purpose[.]" *Id.* at 2423-24. Only if this method does not yield a result may a court consider deferring to an agency's resolution of a genuine ambiguity. *United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021) (en banc).

The potential ambiguity lies in whether the regulation is concerned with the type of credential awarded or whether the regulation is focused on the type of substantive education received. As to the first point, the regulation indicates that a regular high school diploma "does not include a recognized equivalent of a diploma, such as a general equivalency diploma, certificate of completion, certificate of attendance, or *similar lesser credential*." 34 C.F.R. § 300.102(a)(3)(iv) (emphasis added). On its face, a state-issued diploma does not appear to be a "similar lesser credential" when compared to a GED. Yet, the word "credential" raises additional concerns. 34 C.F.R. § 300 does not define "credential." When ascertaining an undefined term's plain meaning, a court may rely upon a legal dictionary. *Da Silva v. Att'y Gen. of U.S.*, 948 F.3d 629, 635-36 (3d Cir. 2020) (quoting, among others, Black's Law Dictionary). Black's Law Dictionary defines "credential" as "[a] document or other evidence that proves one's authority or expertise." *Credential*, Black's Law Dictionary (11th ed. 2019). In light of this definition, a credential is supposed to reflect the holder's expertise. To this end, a New Jersey high school

diploma based solely on a GED would seemingly conflict with 34 C.F.R. § 300.102(a)(3)(iv). Moreover, it is also reasonable to read the regulation as forbidding a state or local authority from terminating a FAPE by issuing an IDEA student a GED, some alternative lesser credential, or a GED masquerading as another degree.   The focus, in that instance, is not exclusively on the credential awarded, but whether the State has discharged its duty to provide a FAPE.

Finding an arguable ambiguity, the Court turns to the tools of interpretation.  *Kisor*, 139 S. Ct. at 2415, 2423-24.  Importantly, the IDEA and its implementing regulations are remedial and thus "to be construed liberally."  *Collingsgru v. Palmyra Bd. of Educ.*, 161 F.3d 225, 232 (3d Cir. 1998), *abrogated on other grounds by Winkelman ex rel. Winkelman v. Parma Sch. Dist.*, 550 U.S. 516 (2007).

The applicable regulation, 34 C.F.R. § 300.102(a)(3)(iv), was amended in 2017.  82 Fed. Reg. 29755 (June 30, 2017).  The previous version of the regulation, in effect from 2006 to 2017, explained that "the term regular high school diploma does not include an alternative degree that is not fully aligned with the State's academic standards, such as a certificate or a general educational development credential (GED)."  71 Fed. Reg. 46540-01, 46763.  Thus, the regulation appeared to assume that a GED degree was not fully aligned with a state's academic standards.  When the regulation was most recently amended, the Secretary of Education explained that the revision's purpose was "to incorporate the definition of 'regular high school diploma' currently included in section 8101(43) of the ESEA."  82 Fed. Reg., at 29756.  The Secretary continued, "[w]e are making this conforming change to ensure that 'regular high school diploma' has the same meaning under the IDEA and the ESEA, and the definition is consistently applied under both programs." *Id.*

Congress reauthorized the ESEA in 2015 as the ESSA.  20 U.S.C. §§ 6301-7981; *Issa v. Sch Dist. of Lancaster*, No. 16-3881, 2016 WL 4493202, at *1 n.1 (E.D. Pa. Aug. 26, 2016), *aff'd*, 847 F.3d 121 (3d Cir. 2017).  The ESSA's definition is as follows:

> The term "regular high school diploma"—
>
> (A)   means the standard high school diploma awarded to the preponderance of students in the State that is fully aligned with State standards, or a higher diploma, except that a regular high school diploma shall not be aligned to the alternate academic achievement standards described in section 6311(b)(1)(E) of this title; and
>
> (B)  does not include a recognized equivalent of a diploma, such as a general equivalency diploma, certificate of completion, certificate of attendance, or similar lesser credential.

20 U.S.C. § 7801(43).  Therefore, unlike the previous definition, under the current versions of 20 U.S.C. § 7801(43) and 34 C.F.R. § 300.102(a)(3)(iv), a high school diploma can be fully aligned with state standards but still be a lesser credential that does not qualify as a "regular high school diploma."

Examining the statutory provision's history further, the Court finds that what would become the current definition of "regular high school diploma" was introduced by the House of Representatives.  H.R. Rep. No. 114-354, at 709 (2015).   Speaking in support of the Act, Representative Davis explained,

> The bill provides critical protections for students with disabilities that I have promoted, such as advancing high learning standards for students with the most significant disabilities.  It caps the use of alternative, less-rigorous tests for students with the most significant cognitive disabilities at one percent of all students and prohibits states from counting lesser credentials as a regular high school diploma.

161 Cong. Rec. H8444-02, H8893 (2015) (statement of Rep. Danny K. Davis).

In light of the federal regulation's 2017 amendment (indicating that a diploma aligned with state standards can nevertheless not qualify as a regular high school diploma) and the IDEA's remedial purpose, the Court finds that a high school diploma based solely on passing a GED exam does not constitute a regular high school diploma under 34 C.F.R. § 300.102(a)(3)(iv).  As a result, the Court finds that Plaintiffs are likely to succeed on the merits, meaning that A.D. is still entitled to a FAPE notwithstanding his state-issued diploma.  Again, the Court does not question the underlying agency decisions insofar as they found that A.D.'s diploma was aligned with New Jersey's standards.  However, the Court remains concerned that A.D.'s state-issued diploma is a GED by another name and, as such, is a lesser credential that has prematurely cut off A.D.'s access to a FAPE.

A.D. was awarded his state-issued diploma on the basis of his GED score, his age, and the fact that he was not in school, in accordance with N.J. Admin. Code § 6A:20-1.4(a)-(1).  His diploma appears to be, in substance, a GED, but with the rights and privileges of a high school diploma.  Indeed, Defendants and the underlying administrative decisions emphasize that A.D.'s diploma signifies that his educational attainment is equal to that of a student with a more traditional state-endorsed diploma.  *E.g.*, D.E. 1 at 46 (Comm'r's decision).  The Supreme Court, however, has explained that mere educational advancement is not the purpose of the IDEA.  In *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982), the Supreme Court explained that it had *not* found "that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'"  *Id.* at 203 n.25.  Although *Rowley* did not set forth a bright-line test for determining when the benefits conferred upon a student are adequate, the Court did instruct that a state must ensure that it provides an eligible child with "personalized instruction with sufficient

16

support services to permit the child to benefit educationally from that instruction." *Id.* at 202, 204.

*See also Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. --, 137 S. Ct. 988,

997, 1000 n.2 (2017).

Moreover, the decision that the ALJ and the Commissioner relied upon, *B.A.*, recognized

that New Jersey has similar concerns. In that matter, the student, M.A.A., had received a degree

from a school in Venezuela that was arguably the equivalent of a high school degree. 2009 N.J.

AGEN LEXIS 730, at *9. The Commissioner faulted the ALJ for treating the issue in a summary

manner and explained that the ALJ should have determined "whether M.A.A.'s possession of the

'Bachiller en Ciencas' degree is indicative that she has already received the requisite education."

*Id.* at *12. The Commissioner explained that a holistic analysis was necessary. *Id.* In the

Commissioner's words,

> the inquiry by its very nature suggests exploration of questions
> including, for example: Have M.A.A.'s courses provided a
> sufficient depth and breadth of program? Was she required to
> demonstrate comparable types of skills and knowledge? Will she
> be able to pursue post-secondary education at institutions requiring
> high school graduation as a prerequisite to admission? Will her
> credential be accepted by an employer as satisfaction of a
> requirement for high school graduation? Has her education
> prepared her to participate meaningfully in the common cultural and
> civic life of our State and nation?

*Id. B.A.*, then, appears to agree with *Endrew F.* and *Rowley* that it is not just the degree itself, but

the education behind it that matters.

Finally, the IDEA itself provides that one of its purposes is "to ensure that all children with

disabilities have available to them a free appropriate public education that emphasizes special

education and related services designed to meet their unique needs and prepare them for further

education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). It is unclear

whether a state-issued diploma, awarded on the basis of a GED score, meets this standard as to

A.D., particularly in light of the express regulation indication that a GED is insufficient.  The foregoing convinces the Court that it is the process and the education itself, and not the name on a degree or credential, that is the purpose and goal of the IDEA.[9]

*A.R. v. Connecticut State Board of Education*, 5 F.4th 155 (2d Cir. 2021), cited by the STBOE, does not mandate a different outcome.  As the Court explained during oral argument, in that decision, the Second Circuit did not decide whether plaintiff A.R. or A.R.'s predecessor, D.J., had received a regular high school diploma within the meaning of the regulation.  *Id.* at 163.  The original plaintiff, D.J., had been enrolled in a Connecticut school and was receiving special education services.  *Id.* at 160.  In 2013, D.J. satisfied the criteria for a high school diploma.  *Id.* His mother, however, acting on D.J.'s behalf, refused to accept the diploma out of concern that it would end D.J.'s eligibility for special education.  *Id.*  The defendant argued that the offer of the diploma mooted the case.  *Id.*  The district court recast the inquiry as one of standing and denied the motion, directing the parties to conduct discovery as it could not determine, without a factual record, whether D.J. had received a diploma and was deprived of standing.  *Id.*  The defendant later moved again on this ground.  *Id.* at 161.

The Second Circuit affirmed the trial court's ruling that there were at least triable issues regarding D.J.'s standing.  *Id.* at 161-62.  Indeed, the Second Circuit went further than the district court, holding that "[t]here was no genuine issue as to whether D.J. received a high school diploma; all of the evidence presented showed that he did not, because he exercised his right to defer."  *Id.* at 163.  In the circuit court's view, then, it was "immaterial whether the diploma proffered to him

---

[9] It does not appear that the Department of Education has provided an interpretation of 34 C.F.R. § 300.102 since the amendment's effective date of June 30, 2017.

would have been a 'regular high school diploma' or one 'fully aligned with State standards' within the meaning of 34 C.F.R. § 300.102(a)(3)." *Id.*

In contrast, there is no dispute in the present matter as to whether A.D. received a state-issued diploma.  Rather, the dispute turns on whether the diploma awarded to him was a "regular high school diploma" within the meaning of 34 C.F.R. § 300.102(a)(3).  The rest of the *A.R.* court's opinion similarly did not address the issue before this Court, as the Second Circuit then turned its attention to the meaning of "public education" as that term is used by the IDEA.  5 F.4th at 163-67.

Accordingly, the Court holds that Plaintiffs have shown a likelihood of success on the merits.  A.D.'s state-issued diploma, though compliant with state standards, is more akin to a GED than a regular high school diploma.  As such, it was not a valid basis to disqualify A.D. from reenrolling in Sparta High School.

**B. Irreparable Harm**

Having determined that Plaintiffs are likely to succeed on the merits, the Court must next assess whether Plaintiffs are likely to suffer irreparable harm without an injunction.  *Winter*, 555 U.S. at 20.  Because Plaintiffs seek a mandatory injunction, Plaintiffs' burden is "particularly heavy[.]"  *Hope*, 972 F.3d at 320 (quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994)).  Their "right to relief must be indisputably clear."  *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972).

Plaintiffs argue that their motion seeks only to preserve the status quo.  D.E. 11 at 19.  They characterize the status quo as "that [which] existed prior to the GED decisions wherein A.D. was entitled to enroll as a high school student at Sparta H.S."  *Id.*  The STBOE disagrees and characterizes the status quo as A.D. being disenrolled.  *See* D.E. 21 at 10-11.  During oral

19

argument, Plaintiffs referred to the stay-put provision of the IDEA and asserted that the status quo

for IDEA purposes is the last-consented-to IEP.  Plaintiffs also rely on *R.B. v. Mastery Charter*

*School*, 532 F. App'x 136 (3d Cir. 2013).  D.E. 11 at 21; D.E. 29 at 4.

The stay-put provision, 20 U.S.C. § 1415(j), mandates that "during the pendency of any

proceedings conducted pursuant to this section, unless the State or local educational agency and

the parents otherwise agree, the child shall remain in the then-current educational placement of the

child."  The Third Circuit has observed that the provision reflects "Congress' policy choice that

all handicapped children, regardless of whether their case is meritorious or not, are to remain in

their current educational placement until the dispute with regard to their placement is ultimately

resolved."  *R.B.*, 532 F. App'x at 139 (quoting *Drinker ex rel. Drinker v. Colonial Sch. Dist.*, 78

F.3d 859, 864 (3d Cir. 1996)).  The purpose of the provision is to stop "school districts from

effecting unilateral change in a child's educational program[.]"  *R.B.*, 532 F. App'x at 140 (quoting

*Susquenita Sch. Dist. v. Raelee S. ex rel. Heidi S.*, 96 F.3d 78, 83 (3d Cir. 1996)).

The Court finds that the stay-put provision does not support Plaintiff's argument.  It is

uncontroverted that, as of the commencement of suit, A.D. had been unilaterally disenrolled from

Sparta High School by M.N.  As a result, the present matter differs from *R.B.* in which the school

(as opposed to the parent) unilaterally disenrolled the student.  *R.B.*, 532 F. App'x at 138.  Plaintiffs

seek a mandatory injunction, triggering the application of the heightened standard.

Plaintiffs argue that they will suffer irreparable harm without an injunction because the

opportunity to enroll in school is a "temporally isolated event," that "once lost, . . .cannot be

recovered."  D.E. 41 at 1; D.E. 29 at 8 (quoting *C.P. v. N.J. Dep't of Educ.*, No. 19-12807, 2020

WL 2611572, at *13 (D.N.J. May 22, 2020)).  Plaintiffs reason that A.D. is danger of aging out of

the IDEA because he is approaching age twenty-one.  D.E. 11 at 25.  The STBOE responds that

compensatory educational services provide a sufficient remedy.  D.E. 21 at 23.  Plaintiffs disagree, contending that compensatory education can only remedy a past violation of the IDEA whereas an injunction is necessary to rectify a prospective injury.  D.E. 29 at 8.  They continue that the denial of a FAPE categorically constitutes irreparable harm.  D.E. 41 at 3-4.

In light of the particular facts of this case, the Court agrees with the STBOE that the availability of compensatory education defeats Plaintiffs' contention that A.D. will suffer irreparable harm without an injunction.  Compensatory education is an equitable remedy created by the courts.  *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717 (3d Cir. 2010); *see also* 20 U.S.C. § 1415(i)(2)(C)(iii) (empowering a court to "grant such relief as the court determines is appropriate.").  The D.C. Circuit has explained that the purpose of compensatory education is "to 'replace[] educational services the child should have received in the first place' and that such awards 'should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.'"  *Ferren C.*, 612 F.3d at 717-18 (alteration in original) (quoting *Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)).  Although a covered student's eligibility for a FAPE terminates at age twenty-one, "an individual over that age is still eligible for compensatory education for a school district's failure to provide a FAPE prior to the student turning twenty-one."  *Ferren C.*, 612 F.3d at 718.

The facts of this matter demonstrate that M.N. has on several occasions decided to discontinue A.D.'s in-person instruction or disenroll him.  Similarly, each time M.N. sought to reenroll A.D., Sparta High School has endeavored to accommodate A.D.—with the exception of the last time, which led to the current suit.  In March 2019, M.N. placed A.D. on full-time home instruction because of apparent concerns over vaping (although A.D. also had many unexcused absences).  A.D. reenrolled in high school the following month, and the school provided home

21

instruction through a software program and some in-person tutoring.  A.D. then started taking in-person classes the following school year, 2019-20.  However, the pandemic began in the spring of 2020, and the high school turned to remote instruction for all students.  In 2019 and 2020, new IEPs were implemented for A.D.  In June 2020, M.N. again withdrew A.D. from school.  The STBOE then permitted A.D. to begin reenrolling for the following school year, 2020-21, but M.N. decided not to complete the process.  Instead, A.D. joined the military until he was discharged in December 2020.  Then, after several months, M.N. sought to reenroll A.D. in April or May 2021.  Until that point, the breaks in A.D.'s education were a result of M.N. and A.D.'s decisions and actions—not those of the STBOE.  As a result, this case is factually distinct from the decisions cited by Plaintiffs.[10]

For example, in *Lofton v. District of Columbia*, 7 F. Supp. 3d 117, 119 (D.D.C. 2013), the school district unilaterally removed the child from a private, special education school to a public high school, where the child was subject to physical harm.  The *Lofton* court found that "[a] failure to provide a FAPE constitutes irreparable injury." *Id.* at 124 (quoting *Massey v. District of Columbia*, 400 F. Supp. 2d 66, 75 (D.D.C. 2005)).  *S.M. ex rel. Michael C. v. Chichester School District*, No. 21-4266, 2022 WL 875232, at *1 (E.D. Pa. March 24, 2022), concerned a boy, S.M., with severe autism whose IEP did not include a residential placement.  S.M. was in a psychiatric hospital for a year and then in a medical residential treatment facility because the district would not agree to a residential IEP.  *Id.*  In the past, S.M. had only made progress while in an educational

---

[10] Plaintiffs also rely on *C.P.*, in which Judge Hillman observed that "[s]everal courts throughout the country have recognized that significant delays or the total failure to provide timely due process hearings itself may constitute irreparable harm."  2020 WL 2611572, at *8.  *C.P.* is inapposite because it concerned the timing of a due process hearing, which is not an issue before the Court.

residential facility.  *Id.*  The district court observed that "[n]umerous courts have found that denial of a FAPE automatically constitutes irreparable injury."  *Id.* at *3 (citations omitted).

In *Issa v. School District of Lancaster*, 847 F.3d 121 (3d Cir. 2017), the plaintiffs were school-aged children who arrived in the United States as refugees.  *Id.* at 125.  "None [were] native English speakers."  *Id.*  The students were enrolled in Phoenix Academy, a school for students at risk of not graduating by age twenty-one.  *Id.* at 125, 127.  The students sought to transfer to another school, which was geared to teach English language learners the skills they needed.  *Id.* at 125.  The defendant refused, and the Third Circuit affirmed the district court's decision to enjoin defendant, finding that the new school was especially well-suited to serve the plaintiffs.  *Id.* at 142.[11]

In *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108 (1st Cir. 2003), a hearing officer determined that the plaintiff, a teenager who was both hearing-impaired and developmentally delayed, was entitled to a sign language interpreter pursuant to the IDEA.  *Id.* at 111-12.  The case arose out of the officer's efforts to compel Puerto Rico's Department of Education to comply with that order.  *Id.*  In reviewing and affirming the district court's determination that the plaintiff would suffer irreparable harm without the interpreter, the First Circuit observed that although the defendants represented that they had tried to comply with the underlying order, the facts revealed that they had not.  *Id.* at 121.  In another instance, the Department had been able to hire an interpreter "within ten days."  *Id.*  These facts, along with the fact that the plaintiff was a still-developing adolescent who had sat through a futile school year, supported the First Circuit's determination irreparable harm was likely.  *Id.* at 121-22.

---

[11] Additionally, *Issa* was not an IDEA case, but instead sounded under Pennsylvania state law and the Equal Educational Opportunities Act of 1974.  *Issa*, 847 F.3d at 125.

Plaintiffs have not consistently kept A.D. enrolled in school.  The STBOE has not taken any action to disenroll A.D., has not acted unilaterally to change A.D.'s IEP, has not ignored a hearing officer's decision, and has not forced A.D. to attend one facility in lieu of a better suited environment.  With the exception of the denial in 2022, STBOE has worked to accommodate Plaintiffs' decisions and provide A.D. with a FAPE.  In addition, Plaintiffs fail to address the gap of several months—from the time when A.D. was discharged from the service to the April/May reenrollment request—in seeking reenrollment.  Similarly, Plaintiffs fail to explain the delay in seeking the current relief:  the ALJ decided this matter on August 25, 2021, and Plaintiffs did not seek the current injunctive relief for approximately four months.  The Court contemplates that a finding of a reasonable likelihood of success on the merits will most often lead to a finding of irreparable harm in an IDEA case.  However, under the unique circumstances of this case, the Court finds that Plaintiffs have not sufficiently demonstrated irreparable harm and that compensatory services will suffice.

Because the Court finds that Plaintiffs have not sustained their burden as to irreparable harm, the Court denies the motion for a preliminary injunction without reaching the two additional factors.[12]

---

[12] The Court further denies Plaintiffs' motion to file a sur-reply, D.E. 49.  Again, the parties did not seek until late in the day to make the administrative record available for the Court's review, despite the IDEA's command that the administrative record be received by the court.  20 U.S.C. § 1415(i)(2)(C)(i).   Further, Plaintiffs' representation "that there is no live testimony in the administrative record below" does not appear to be accurate, and it does not appear that the proffered testimony would speak to the Court's concerns discussed above.

## IV.    CONCLUSION

For the reasons stated above, the motion is denied.  An appropriate Order accompanies this

Opinion.

Dated: April 12, 2022

John Michael Vazquez, U.S.D.J.